1           UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                    ASHEVILLE DIVISION

3    UNITED STATES OF AMERICA      )
                                   )
4                                  )
                                   )
5              vs.                 )     DOCKET NO. 1:21-cr-32
                                   )
6                                  )
                                   )
7    CASEY LEE EVANS,              )
                                   )
8                                  )
     Defendant.
9

10        TRANSCRIPT OF MOTION AND DETENTION HEARINGS
          BEFORE THE HONORABLE W. CARLETON METCALF
11             UNITED STATES MAGISTRATE JUDGE
                     APRIL 30, 2021
12

13   APPEARANCES:

14   On Behalf of the Government:

15        David Andrew Thorneloe
          United States Attorney's Office
16        233 U.S. Courthouse Building
          100 Otis Street
17        Asheville, North Carolina  28801

18   On Behalf of the Defendant:

19        Jeffrey W. Gillette
          Gillette Law Firm PLLC
20        3809 Bryson City Road
          P.O. Box 32
21        Franklin, North Carolina  28744

22
              Deborah Cohen-Rojas, C.S.R., R.D.R., C.R.R.
23                   Official Court Reporter
          Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
24    *Proceedings recorded by mechanical stenography, transcript
            produced by computer-aided transcription.*
25

1                          I N D E X

2                    E X A M I N A T I O N

3

4                      DERIK BREEDLOVE

5    Direct Examination by Mr. Thorneloe                    6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The Court will call the case of the United

2    States versus Casey Lee Evans, Case 1:21-cr-32.  This matter is

3    before the Court this morning for motion hearing, as well as a

4    detention hearing.

5          On the proceedings the other day, it would appear to me

6    that there is the Government's motion for pretrial detention

7    still pending.  Now the Government has made a motion for a

8    determination of the defendant's mental competency under

9    4241(a), also a motion for an examination to determine his

10   sanity at the time of the offense under 4242(a).  So I think

11   I'll take up first the competency-hearing motion and then

12   proceed as necessary with the other two.

13         Is there anything the Government would add by way of

14   procedural posture?  Do I have that correct?

15         MR. THORNELOE:  You do have as to this point correct,

16   your Honor.  I've discussed this a little bit further with

17   Mr. Edwards, who's the assigned assistant United States

18   attorney in this case, and he asked me to withdraw the

19   Government's motion under 4242(a), the motion for a

20   determination of the existence of insanity at the time of the

21   offense.  So at this time we're withdrawing that portion of the

22   motion and we'd like to proceed under 4241.

23         Before we present any evidence, I just want to point out

24   to the Court what the Government believes is the standard by

25   which the Court should determine whether to order this

1  competency examination.  And it is under 4241(a).  It says the

2  Court shall grant the motion or shall order such a hearing on

3  its own motion if there is reasonable cause to believe the

4  defendant may presently be suffering from a mental disease or

5  defect.  And it goes on, your Honor.

6       So we believe our standard is reasonable cause to believe

7  is what we need to arrive at for the Court to grant the

8  Government's motion.

9       THE COURT:  All right.  Well, first of all, I'll note

10 the Government's withdrawal of its 4242(a) motion, then.  So we

11 have two motions now pending, the motion for detention, of

12 course, and then the motion for a competency examination -- or

13 excuse me -- a competency hearing, a hearing to determine

14 mental competency under 4241(a).  It makes sense to me, I

15 believe, to take up that motion first and then proceed with the

16 detention motion to the extent that there needs to be one.

17      At this point, Mr. Gillette, anything you want to say

18 about the procedural posture here?

19      MR. GILLETTE:  Your Honor, I think what you said and

20 Mr. Thorneloe said is absolutely correct.  It makes sense to do

21 that first, and then we'll see if the detention hearing is

22 still an issue.

23      THE COURT:  Does the defendant object to the

24 Government's motion for a mental-competency hearing?

25      MR. GILLETTE:  Yes, your Honor.  I'd say the defendant

1  feels that the standard that Mr. Thorneloe has begun to

2  articulate and then goes further beyond the words that he --

3  that he ended with does not apply -- does not appear to apply

4  yet in his case.

5          THE COURT:  All right.  Very well.  Then I will hear

6  from the Government with regard to its 4241(a) motion.

7          MR. THORNELOE:  Thank you, your Honor.  I do ask the

8  Court to consider the indictment concerning the defendant.

9          THE COURT:  All right.  That's noted.  Anything

10 further?

11         MR. THORNELOE:  We'd also ask the Court to consider

12 the pretrial services report, your Honor.

13         THE COURT:  Any objection?

14         MR. GILLETTE:  No objection, your Honor.

15         THE COURT:  That will be allowed for that purpose, as

16 well.

17         MR. THORNELOE:  And your Honor, we'd ask the Court --

18 the Government would call the United States Forest Service

19 Special Agent Derik Breedlove to the stand.

20         THE COURT:  All right.  Agent, come around to be

21 sworn.

22     (Witness sworn.)

23         THE COURT:  You may proceed, Mr. Thorneloe.

24 ///

25 ///

### EXAMINATION OF DERIK BREEDLOVE

1    MR. THORNELOE:  Thank you, your Honor.

2    **DERIK BREEDLOVE, GOVERNMENT'S WITNESS, DIRECT EXAMINATION**

3    **BY MR. THORNELOE:**

4  Q    Good morning, Agent Breedlove.  Please state your full

5  name.

6  A    Derik Breedlove.

7  Q    And how are you employed?

8  A    I'm a special agent with the US Forest Service.

9  Q    Where's your area of assignment?

10 A    The national forest in North Carolina.

11 Q    Does that include the Pisgah and Nantahala forest?

12 A    Yes, sir.

13 Q    Are you familiar with the defendant, Casey Evans?

14 A    Yes, I am.

15 Q    And how did you become familiar with him?

16 A    I responded to and started investigating a fire back last

17 year, April 3rd.

18 Q    Where was that fire?

19 A    Within the Nantahala national forest, kind of the

20 headwaters of the Cals Cove Road.

21 Q    Okay.  What city or town would it be near?

22 A    Franklin, North Carolina.

23 Q    Okay.  And then eventually did you develop the defendant

24 as a suspect in that investigation?

25 A    Yes.

EXAMINATION OF DERIK BREEDLOVE

1 Q    And tell us -- tell the Court what this fire you're

2 referring to -- what -- what -- what burned and what was the

3 extent of the fire?

4 A    Approximately 90 acres ended up burning of both private

5 and national forest.  The firefighters fought the fire for a

6 few days last April.  I think weather made it jump up again the

7 next day.

8 Q    And you eventually developed the defendant as a suspect in

9 starting that fire; is that right?

10 A    Correct.

11 Q    And did you have a chance to interact with the defendant

12 any?

13 A    Yes, I did.

14 Q    Okay.  To what extent?

15 A    I had just contacted him not the day of the fire -- I

16 wasn't there the -- I'm not the local uniformed officer there

17 so I contacted him a few days later.  There at his house, in

18 the driveway passing, was my first contact with him.

19 Q    Okay.  And in the course of your investigation, have --

20 you've learned things that caused you to believe that the

21 defendant may have some sort of impairments or difficulties

22 concerning his mental health?

23 A    Yes.

24 Q    Let's start at the beginning.  What's the first thing that

25 came up that led you to have concerns about that?

### EXAMINATION OF DERIK BREEDLOVE

1  A    Where the fire was in that area, people advised me to be

2  careful to go into the area just based on the past history of

3  the area and that residence at the end involving Mr. Evans.

4  And then I later learned that there had been an attempt to cut

5  off or amputate one of his limbs by himself.

6  Q    Okay.  Let's talk about that issue.

7          THE DEFENANT:  What does that have to do with the

8  fire?

9          THE COURT:  Sir --

10          THE DEFENANT:  Objection.  What does that have to do

11  with the fire?

12          THE COURT:  Mr. Evans, I'm going to advise you about

13  something here, a couple things.  First of all, you have the

14  right to remain silent.  Anything that you may say may be used

15  against you by the Government.

16          THE DEFENANT:  I have a right to --

17          THE COURT:  Mr. Evans --

18          THE DEFENANT:  What does that have to do with the

19  fire, was my question.

20          THE COURT:  I'm now, going to advise you of another

21  thing, Mr. Evans, and that is that you are disrupting this

22  proceeding.  If you continue to do that, you will be removed

23  from the courtroom.

24          THE DEFENANT:  Am I on trial for a fire?  Yes or no.

25          THE COURT:  I'll give you a moment, Mr. Gillette.

EXAMINATION OF DERIK BREEDLOVE

1    MR. GILLETTE:  Mr. Evans, listen to me, please.
2  (Inaudible.)

3    THE DEFENDANT:  Well, they need to stick to the subject
4  at hand, is the fire.

5    MR. GILLETTE:  I'm going to ask the questions that
6  need to be asked, but the subject at hand isn't --

7    THE DEFENDANT:  Right.  My hand isn't the subject, the
8  fire is.  You're right.

9    MR. GILLETTE:  The Government has a motion to have you
10  evaluated psychologically --

11    THE DEFENDANT:  Well, they still can't evaluate me
12  under the wrong name.  That ain't even my fucking name.  That's
13  how dumb they are.

14    THE COURT:  All right.  I've heard enough.

15    THE DEFENDANT:  Me, too.  I'm gladly leaving.

16    MR. GILLETTE:  Mr. Casey --

17    THE DEFENDANT:  My name is James Casey Lee Evans.  You
18  been holding me under the wrong name long enough.  This is a
19  Mickey Mouse, bullshit court.  I'm out.  This is bullshit.  I
20  know my rights, and you're violating the shit out of my
21  religious rights.  Piss on you and your court.  You heard me.
22  I speak for the Lord.  God said so, mother-fucker.  Violate my
23  fucking rights, pig.  Fuck you.  (Inaudible.)

24    MR. GILLETTE:  Your Honor, in light of this, I think
25  we would drop our objection to the Government's motion.

EXAMINATION OF DERIK BREEDLOVE

1        THE COURT:  All right.  I'm going to take a brief

2   recess, and I'm going to look at the law of contempt for just a

3   moment.  We'll take a brief recess and come back in a moment.

4        (A recess was taken.)

5        THE COURT:  The Court is now back in session.  For the

6   record, let me make one or two observations.

7        As the record will reflect, prior to the recess, while

8   Agent Breedlove was testifying, the defendant started making

9   outbursts.  The Court advised him of his right to remain silent

10  and began advising him, under Rule 43, that he was disrupting

11  the Court's proceedings and that, if his conduct persisted, he

12  would be removed.

13       Notwithstanding the Court's admonition, he continued to

14  speak.  I gave him an opportunity to speak with his attorney,

15  but his tone of voice in the courtroom was such that I presume

16  everyone could hear it -- I certainly could from the bench --

17  and he began becoming profane with his counsel.

18       So I did order him removed from the courtroom.  And in the

19  process of that course, he was quite profane and belligerent

20  and aggressive physically with the marshals.  Two marshals did

21  have to remove him physically from the room.  He continued to

22  yell as he was going down the hall.

23       I'll note that Mr. Gillette has indicated the defense now

24  withdraws its objection to the Government's 4241 motion.  I do

25  think it would be appropriate, though, to go ahead and continue

EXAMINATION OF DERIK BREEDLOVE

1 the evidence in that regard and go ahead and put that on the

2 record so that that will be before the Court. Agent Breedlove

3 is already on the stand, so let's go ahead and continue with

4 that. Mr. Thorneloe.

5          MR. THORNELOE: Thank you, your Honor.

6 Q   Agent Breedlove, we were discussing a matter involving --

7 something involving the defendant's arm. Could you tell the

8 Court what your basis of knowledge is for that and what it is

9 you were getting ready to get into there.

10 A   Macon County, which is where the fire and Mr. Evans

11 resides in, had received a 911 call in reference to someone's

12 bleeding. I'm not sure who placed the call at that time. They

13 intercepted them, an ambulance did, on the drive to the

14 emergency room somewhere just south of Franklin and took and

15 they -- his arm was bleeding.

16      They put the tourniquet on him, and he had stated to the

17 paramedics at that time -- and I do personally know and called

18 and confirmed that -- he had been told by God that he should

19 cut his hand off, that would release the devil from his body,

20 that he was attempting to -- had considered cutting his head

21 off, but he didn't think he could be successful in doing so

22 before he wouldn't make it, so he tried to cut his hand off.

23      And he'd been reading the Old Testament of the Bible. And

24 I think it -- it had said that he could just cut his right

25 hand, so -- he's right-handed, so he chose to try to cut his

EXAMINATION OF DERIK BREEDLOVE

1 left hand.

2 Q    And do you know when this event would have occurred?

3 A    It was March 16th, 2019.

4 Q    Okay.  So it was a little over a year before the event in

5 the indictment?

6 A    Correct.

7 Q    Okay.  And you said your basis of knowledge was talking to

8 the paramedic that was involved and responding to that?

9 A    Correct.

10 Q    Okay.  Have you had an opportunity to talk to any family

11 members, associates, or friends of the defendant about his

12 mental condition?

13 A    Yes, I have.

14 Q    Who have you talked to?

15 A    I have talked to -- he said he was -- Mr. Evans's best

16 friend, which is Travis Greg (phonetic).  I talked to a girl

17 that described herself as his sister, but I later found out

18 it's not his biological sister.  I talked to both of them the

19 same day.

20 Q    Okay.

21 A    And then I talked to, just as soon as yesterday, as most

22 recently, Miss Neela Bush (phonetic).

23 Q    Let's talk about that first person.  You said his best

24 friend.  Is that --

25 A    That's what he described himself as.

EXAMINATION OF DERIK BREEDLOVE

1  Q    Okay.  And that is who?

2  A    Mr. Travis Greg.

3  Q    And what did Mr. Greg tell you about the defendant's

4  mental state?

5  A    He told me that he hears things, hears voices, that he

6  believes those voices, and that he had told him, the day that

7  he had set the fire, it was to burn the mountain to rid it of

8  ill repute.

9  Q    Okay.  Did you learn anything about what the defendant

10  believed his motivation or reason for burning the mountain was

11  or who directed him to burn the mountain?

12  A    Yes.  He stated that to our uniformed officer the day of

13  the fire, that someone had told him to burn the mountain off

14  for the betterments of the citizens of Macon County, and then

15  later approached our uniformed officer again and told him that

16  the guy that had told him to do that is God.

17  Q    Okay.  Did it seem as though he was hearing an audible

18  voice to direct him to do this?  Is that your impression of --

19  the way it was explained to you?

20  A    The way Officer Blaine explained it to me, that he felt

21  like he needed to be -- the Bible tells him to be honest and

22  that he approached him, and then came a third time, actually,

23  and said I'm ready to go to jail.  Officer Blaine had stated

24  I'm not taking you to jail today.  And he stated I violated

25  man's law, and God says, if you violate man's law, you must pay

EXAMINATION OF DERIK BREEDLOVE

1  for it.

2  Q    Okay.  You also mentioned someone the defendant referred

3  to as his sister had talked to you about his mental health.

4  Who was that individual again?

5  A    Her name is April Nations (phonetic).

6  Q    And what did she tell you?

7  A    She was at the residence with Travis Greg the same day and

8  described herself as the sister.  However that is not a

9  biological sister.  And she said that he hears voices, that he

10  thinks God speaks directly to him, and that she wanted to get

11  him help because it's ongoing, and God always talks to him when

12  he gets what she described as crazy.

13  Q    Okay.  And did she know anything about whether he's

14  receiving mental-health treatment?

15  A    She mentioned to me -- and this is again -- yesterday I

16  talked to her again, that someone in their family had attempted

17  to just most recently -- you'll have to help me with the

18  words -- involuntary commit him --

19  Q    Okay.

20  A    -- but evidently something got messed up there, and he got

21  arrested by Macon County and has been detained ever since.

22  Q    Okay.  So it's your understanding that someone in his

23  family had attempted to initiate an involuntary commitment

24  concerning Mr. Evans?

25  A    Correct.

EXAMINATION OF DERIK BREEDLOVE

1  Q    But that's never actually happened as far as you know?

2  A    As far as I know, I don't think it's happened.

3  Q    Okay.  And was there another individual, too, you spoke to

4  about his mental health?  Was there a third person?

5  A    He had approached one of the firefighters April the 5th,

6  B.J. Keno [phonetic] with the North Carolina state, and had

7  talked to him about the fire and that there was a missing

8  radio.  And that's what the conversation started as.

9      And then Mr. Evans stated that he didn't understand why

10  people were putting the fire out, that it was for the

11  betterment of Macon County and such.  He later told them that

12  he had been on the mountain for days praying and fasting and

13  that he had, in fact, saw the sun rise in the west instead of

14  in the east.  And then after he had set the fire, he watched

15  the winds from all four corners of the earth blow to the fire

16  and that he watched the fire burn up and down the same tree two

17  different times.  And he didn't believe the fire was that hot,

18  so he got in the fire and laid down.

19  Q    Okay.  And now, you've never actually had the chance to

20  interview the defendant yourself, have you?

21  A    Correct.

22  Q    Have you ever tried to call the defendant or someone in

23  his household and overheard the defendant in the background?

24  A    Yes, I have.  With April Nations that day -- I received

25  information that Mr. Evans might be staying at her house, so I

EXAMINATION OF DERIK BREEDLOVE

1 went there to try to interview him, however he was not there.

2 They were.

3      She told me that was her brother, and I said, when is a

4 good time to interview him?  And they were trying to tell me

5 what time of day to interview him.  The safest time would be

6 sometime in the morning, before he's -- he gets up and goes to

7 the mountain, does anything out of the ordinary, that would be

8 the best time.  And then she said that she would call him and

9 see if I could interview him that day.  However, when she did,

10 on the phone he was screaming, telling him to come up here,

11 I've got something for them.

12 Q    So you could hear him in the background?

13 A    I could.

14 Q    Okay.  And you said you heard him say I've got something

15 for him?

16 A    I could just hear this -- the yelling, but that's what she

17 had -- she had advised she wouldn't go that day due to that, so

18 I could not interview him.

19 Q    And was that voice consistent with the person you know to

20 be Casey Evans in the background?

21 A    Yes.  It was over the phone, but I wasn't -- I don't want

22 to say that I for sure knew that.

23 Q    Okay.  Okay.  Is there any other information you want to

24 share with the Court about what you know about the defendant's

25 mental health?

EXAMINATION OF DERIK BREEDLOVE

1 A    I just spoke with Neela Bush yesterday on the phone.  And

2 I think some of it's repetitive, but the day he supposedly

3 attempted to cut his hand or arm off that he went to go in his

4 camper, which is where he stays a lot, and that the devil had

5 his child.  And he had seen that the devil had had his child --

6 either their head already off or was about to if he didn't do

7 that.  So that's what they said the reason was, him doing that.

8        And then also that ambulance -- one of the paramedics got

9 in the truck, attempted to help him that day, but Mr. Evans

10 looked at them and said they were actually, in fact, Satan,

11 and, I guess, got belligerent in the ambulance, so that

12 paramedic actually left.  He was calm with the others.

13 Q    Okay.  All right.  Anything else I haven't asked that you

14 feel would be helpful for the Court to know?

15 A    I have no factual, other than the warnings I've received

16 from other deputies and such as far as trying to contact him.

17 Q    Okay.  So other deputies have warned you about his

18 explosive nature?

19 A    Correct, and his mental state of mind.

20        MR. THORNELOE:  Okay.  All right.  Thank you, Agent

21 Breedlove.  Those are my questions.  Please answer any

22 questions from the defense.

23        THE COURT:  Cross-examination, Mr. Gillette?

24        MR. GILLETTE:  I have no questions, your Honor.

25        THE COURT:  Thank you, Agent Breedlove.  You may step

1 down.

2      THE WITNESS:  Thank you.

3      (Witness excused.)

4      THE COURT:  Any further evidence by the Government?

5      MR. THORNELOE:  No, your Honor.  I would ask the Court

6 to consider the observations that the Court had here today.  I

7 can make arguments about that, as well.

8      THE COURT:  All right.  Very well.  All right.  Does

9 the defense want to put on any evidence, Mr. Gillette?  I note

10 that you did say that --

11      MR. GILLETTE:  No, we have no evidence.

12      THE COURT:  All right.  That will be fine.  I'll hear

13 argument, then, from the Government.

14      MR. THORNELOE:  Your Honor, the standard here is a

15 relatively low bar for the Government, reasonable cause to

16 believe the defendant may presently be suffering from the

17 mental disease or defect rendering him mentally incompetent to

18 the extent he is unable to understand the nature and

19 consequences of the proceedings against him or to assist

20 properly in his defense.

21      And so, your Honor, we heard today from the agent, who

22 provided a little history of the defendant, things he's learned

23 from other officers and family members and paramedics.  We have

24 one particularly just sort of extreme incident, where the

25 defendant apparently tried to cut his own arm off because he

1 believed he heard the voice of God telling him to do so. And
2 we have other things related to the fire, where the defendant
3 apparently believed that God had told him to set this fire, and
4 the defendant observed certain things about the fire that are
5 suggestive of some sort of mental-health illness.

6 We also have where the officer himself heard the defendant
7 ranting over the phone, apparently, in the manner I would
8 submit is consistent with what the Court saw here today. And I
9 think it's equally helpful, as the officer's testimony is, just
10 the defendant's behavior here today.

11 We heard the defendant say what am I on trial for, what
12 does this have to do with the fire, suggesting he did not
13 understand why we are here today, that he did not understand
14 this is not the trial, this is about a mental-health/competency
15 issue.

16 We also saw the defendant get an opportunity to interact
17 with his defense counsel here, and the defendant was clearly
18 unable to assist his counsel in his own defense and unable to
19 manage his behavior in a way that is helpful to himself.

20 And so, your Honor, we have the history from the agent,
21 and we have how he's behaving here today now. And we think
22 this clearly meets the standard in the 4241(a), especially with
23 the not being contested by defense counsel. The Court should
24 order this determination of mental competency.

25 THE COURT: If the motion is granted under 4241(a),

1  that would mean that there would be a hearing scheduled for

2  that purposes.  Does the Government also seek an evaluation in

3  4241(b)?

4        MR. THORNELOE:  Yes, your Honor.  There would be an

5  evaluation -- what we'll ask for is the defendant to be sent

6  away for a psychological evaluation at Butner or some other

7  facility and that that -- the hearing would occur once we have

8  the results of that examination.

9        THE COURT:  All right.  Thank you.

10        Mr. Gillette.

11        MR. GILLETTE:  Yes, your Honor.  The Court has heard a

12  great deal of history.  I think the history probably will be

13  more important as these proceedings continue, whenever they

14  continue, but I think that Mr. Thorneloe has properly pointed

15  the Court's attention to the standards of 4241, and that being

16  understanding the nature of the proceedings taking place, which

17  I believe I concur with Mr. Thorneloe that it appears that

18  Mr. Evans was clearly unable to understand why he was here

19  today and is unable to assist in his own defense.

20        I think that does meet the standard of 4241.  I also

21  concur that the appropriate next step is going to be to have a

22  psychiatric evaluation done and on the basis of that, then,

23  reconvene in a hearing to determine whether, in fact, he's

24  capable to proceed or not.

25        I -- I've had many clients over the years, and I can't say

1  that I've ever been quite in this particular situation before

2  and hope not to be in this situation again.

3          THE COURT:  All right.  Mr. Gillette, as I understand

4  the Government's position as to the evaluation, the request is

5  that he be sent to a BOP facility for that purpose.  Do you

6  have any objection to an inpatient evaluation?

7          MR. GILLETTE:  Do not have any objection.  I think he

8  would prefer something closer to home, but I think the Court

9  has much more experience and competence knowing what type of an

10  evaluation will best assist the Court and the attorneys in

11  presenting that evidence.  If it's an inpatient evaluation in a

12  BOP facility, that would be perfectly appropriate.

13          THE COURT:  All right.  I think it is -- it is

14  possible in some circumstances to have an evaluation outside of

15  the BOP facility.  Given the events of today, however, I think

16  that's seriously called into question, whether that would be

17  appropriate.  There is still a motion pending by the Government

18  for detention, but if there was anything you wanted to say

19  about inpatient versus outpatient evaluation --

20          MR. GILLETTE:  I think the safety of the person who

21  participate in that evaluation, the mental-health

22  professionals, is certainly a consideration for the Court to

23  take.

24          THE COURT:  All right.  Thank you.

25      Anything further from the Government?

1          MR. THORNELOE:  No, your Honor.

2          THE COURT:  I am going to grant the Government's

3  motion pursuant to 4241(a) and will order that the defendant --

4  a hearing to determine his competency be scheduled.  And I'm

5  also going to grant the Government's request that a psychiatric

6  or psychological examination be conducted prior to that

7  hearing.  I do believe it would assist the Court and the

8  parties in considering this case, so that will be allowed.

9      Let me come back to two other proceedings or two others

10  issues.  With regard to his -- the Government's motion for

11  pretrial detention, I believe that will need to be held in

12  abeyance.

13      Mr. Gillette.

14          MR. GILLETTE:  Absolutely, your Honor.  We would

15  certainly ask that that be continued until the results of the

16  competency hearing are known.

17          THE COURT:  And the other question -- well, do you

18  agree with that, Mr. Thorneloe?

19          MR. THORNELOE:  I do, your Honor.

20          THE COURT:  All right.  The other issue is the

21  potential contempt issue that arose prior to the recess today.

22  Given now that the Court has granted the Government's motion

23  and will send the defendant off for an evaluation and the

24  consideration of competency, my inclination is to hold that

25  matter in abeyance until further proceedings.  I think that

1 would be appropriate. I believe, before any sanction of

2 contempt would be entered, he would need to be given an

3 opportunity to have notice about that and have a chance to be

4 aware of what was happening, given the circumstances here that

5 may be in question. So my inclination is to hold that issue of

6 contempt in abeyance, as well.

7      Mr. Thorneloe, does the Government have a view on that

8 issue?

9           MR. THORNELOE: Your Honor, the Government has no

10 objection to that course.

11           THE COURT: All right. Mr. Gillette.

12           MR. GILLETTE: Your Honor, I think the defense feels

13 that's entirely appropriate and the right thing to do.

14           THE COURT: All right. Thank you. Will there be

15 anything further, then, from the Government in Mr. Evans's case

16 today?

17           MR. THORNELOE: No, your Honor, not today.

18           THE COURT: Mr. Gillette, from the defense?

19           MR. GILLETTE: Your Honor, I would just call the

20 Court's attention to something that my client did say, that his

21 legal name is James Casey Lee Evans. And I don't know to what

22 extent that can be corrected administratively, but he feels

23 fairly strongly that he wants to be known by his proper legal

24 name.

25           THE COURT: All right. Thank you for mentioning that,

1  Mr. Gillette.  I know that Mr. Thorneloe is taking notes about

2  that, so, if there is anything that needs to be done, I'm sure

3  the Government will address that, as well.

4       Very well.  Then that will conclude all the matters in

5  Mr. Evans's case for today.

6       (End of proceedings.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, DEBORAH COHEN-ROJAS, Federal Official Court
Reporter for the United States District Court for the Western
District of North Carolina, a Certified Shorthand Reporter,
Registered Diplomate Reporter, and Certified Realtime Reporter,
do hereby certify that I reported by machine shorthand the
foregoing proceedings contained herein on the aforementioned
subject on the date herein set forth, and that the foregoing
pages constitute a full, true and correct transcript.


        Dated this 13th day of June, 2022.


_____
        DEBORAH COHEN-ROJAS
        CSR, RDR, CRR
        Federal Official Court Reporter